IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SECURA SUPREME INSURANCE COMPANY,

      Plaintiff,

v.                                  Case No. 2:23-cv-691

MJC AMERICA, LTD.,
GREE USA, INC.,
HONG KONG GREE ELECTRIC APPLIANCE SALES, LTD., and
GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI,

      Defendants.

## COMPLAINT

      The plaintiff, for its complaint against the above-named defendants, states:

### PARTIES

1.   SECURA Supreme Insurance Company ("SECURA") is a domestic company licensed to sell insurance in the State of Wisconsin. Its principal office is located at 1500 Mutual Way, Neenah, Wisconsin.

2.   MJC America, Ltd. ("MJC America") is a company incorporated under the laws of the State of California. Its principal place of business where its officers and directors control the company's operations is located at 280 S. Lemon Ave., #1507, Walnut, California. Its registered agent for service of process is Simon Chu, 280 S. Lemon Ave., #1507, Walnut, California.

3. Gree USA, Inc. ("Gree USA") is a company incorporated under the laws of the State of California. Its principal place of business where its officers and directors control the company's operations is located at 4195 Chino Hills Parkway, #1026, Chino Hills, California. Its registered agent for service of process is Cogency Global Inc., 1325 J. St., Ste. 1550, Sacramento, California.

4. Hong Kong Gree Electric Appliance Sales, Ltd. ("Gree Hong Kong") is a Hong Kong, China, business entity that most resembles the U.S. business form of a corporation, with its principal place of business where its officers and directors control the company's operations located at Unit 2612 Miramar Tower, 132 Nathan Road, Tsin Sha Tsui Kowloon, Hong Kong, S.A.R. Gree Hong Kong is a citizen of the People's Republic of China.

5. Gree Electric Appliances, Inc. of Zhuhai ("Gree Zhuhai") is a Chinese business entity that most resembles the U.S. business form of a corporation, with its principal place of business where its officers and directors control the company's operations located at West Jinjixi Road, Zhuhai, China, and is a citizen of the People's Republic of China.

## JURISDICTION AND VENUE

6. The amount in controversy is over $75,000.00.

7. The court has subject matter jurisdiction over this matter under 28 U.S.C. §1332, because the plaintiff is incorporated, resides and maintains its principal place of business in a state (Wisconsin) diverse from the states in which the defendants are incorporated, reside and maintain their principal places of business (California and China).

8. The court has personal jurisdiction over the defendants because they have purposefully availed themselves to the benefit of the laws of this judicial district by regularly transacting and/or conducting business in the State of Wisconsin.

9. This court has regularly exercised jurisdiction over several of the defendants, most recently in cases 1:22-cv-00540-WCG, 1:22-cv-00608-WCG and 2:22-cv-00136-JPS.

10. Accordingly, pursuant to 28 U.S.C. §1391(c)(2), MJC America, Gree Hong Kong and Gree Zhuhai are all "deemed to reside" in the State of Wisconsin.

11. Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because the property damage at issue is situated in the Eastern District of Wisconsin.

12. Service of process upon Gree Zhuhai and Gree Hong Kong can be accomplished in the United States without implicating the Hague Convention, as demonstrated in at least the following cases in which Gree Zhuhai and/or Gree Hong Kong were served in the United States, filed motions to dismiss for improper service, and the motions were denied, service being deemed proper: *State Farm Fire & Cas. Co. v. Gree USA, Inc.,* No. 3:18-CV-349-RLM-MGG, 2019 WL 4674611 (N.D. Ind. Sept. 25, 2019); *Erie Ins. Exch. v. Gree USA, Inc.,* No. 3:CV-18-2126, 2019 WL 1405854 (M.D. Pa. Mar. 28, 2019); *Nationwide Mut. Ins. Co. v. Gree USA, Inc.,* No. CV 18-1105, 2019 WL 1244093 (W.D. Pa. Mar. 1, 2019), report and recommendation adopted, No. CV 18-1105, 2019 WL 1243280 (W.D. Pa. Mar. 18, 2019); *Nationwide Prop. & Cas. Ins. Co. v. Gree USA, Inc.,* No. 2:18-CV-00881, 2018 WL 6419955, (S.D. Ohio Dec. 6, 2018); *Nationwide General Ins. Co. v. Gree USA, Inc., et al.*, 3:18-cv-12607 (E.D. MI. November 7, 2018). The Hague Convention is not implicated when service of process is made in the United States, not abroad.

3

## FACTS REGARDING THE DEHUMIDIFIER

### *Background - the Joint Venture with MJC America*

13. Gree Zhuhai is a Chinese company that manufactures household appliances ("Gree appliances") for sale in the United States.

14. Gree Hong Kong is a subsidiary of Gree Zhuhai that exports Gree appliances to the United States.

15. Gree USA is a subsidiary of Gree Hong Kong. Gree USA was a joint venture between Gree Hong Kong and another company, MJC America Holdings, Inc. ("MJC America Holdings"). Gree Hong Kong was the majority owner of Gree USA. Gree USA's Chief Executive Office ("CEO"), Chief Financial Officer ("CFO"), who was the brother of Gree USA's CEO, and Chief Administrative Office ("CAO") were owners of MJC America Holdings. Gree USA's CEO, CFO and CAO effectively controlled Gree USA. Gree USA sold Gree appliances to retailers in the United States. Those Gree appliances were manufactured by Gree Zhuhai and imported into the United States by Gree Hong Kong and Gree USA.

### *Falsification of UL Certification*

16. Gree Zhuhai and Gree Hong Kong represented to MJC America, Gree USA, retailers and the general public that its dehumidifiers were certified by Underwriter's Laboratory ("UL") and that the design and materials used in the manufacturing of its dehumidifiers complied with UL Standard 474 and Standard 94.

17. As part of the UL certification process, Gree Zhuhai and Gree Hong Kong made representations to UL that the plastics used in the construction of its dehumidifiers complied with fire ratings in UL 94.

4

18. UL 94 requires that consumer electric products, including dehumidifiers, use plastics that have specific burn and flame rates in order to prevent, reduce and limit the risk of fire hazards.

19. In its application for UL certification under UL 474, Gree Zhuhai represented that the materials and plastics used to manufacture and construct its dehumidifiers were compliant with UL 94.

20. Gree Zhuhai and Gree Hong Kong made these false and misleading representations knowing that the materials and plastics used to manufacture and construct its dehumidifiers were not compliant with UL 94's burn and flame rate requirements.

21. Gree Zhuhai and Gree Hong Kong made these false and misleading representations knowing that UL was unable to independently conduct the burn/flame resistance testing set forth in UL 94, and that UL relied on Gree Zhuhai's representations in the certification documents stating that Gree Zhuhai had these tests performed and the dehumidifiers complied with UL 94.

22. US retailers will not purchase and sell dehumidifiers that are not certified by UL.

23. Gree Zhuhai and Gree Hong Kong's falsification of the UL Certification process was done for the purpose of misleading UL into improperly certifying the dehumidifiers, and in so doing, Gree Zhuhai and Gree Hong Kong defrauded and misled US retailers and consumers into purchasing its dehumidifiers on the false belief that the dehumidifiers were designed and manufactured in compliance with UL standards.

*Gree Zhuhai's Knowing Sale of Defective Dehumidifiers*

24. Gree Zhuhai was an original equipment manufacturer for General Electric branded dehumidifiers.

25. In late 2010, GE instructed Gree Zhuhai to make certain design changes and product improvements to GE branded dehumidifiers that Gree Zhuhai manufactured.

26. The design changes were mandated by GE due to product failure issues with the dehumidifiers, including overheating issues and fires.

27. The GE mandated design changes required a) the removal of electrical terminal sleeves that used PVC materials; b) the use of UL 94 V0 rated plastics for structural components of the dehumidifiers, including the fan shroud base, center support and external cabinet; and c) the use of UL 94 flammability rated materials for the terminal cover.

28. Starting in its January 2011 production run, Gree Zhuhai made the above requested changes for GE dehumidifiers.

29. Gree Zhuhai did not make the GE mandated design changes for dehumidifiers manufactured under other brand names, including the dehumidifiers that it was manufacturing and selling to Gree USA.

30. Gree Zhuhai did not make the GE mandated design changes to other brands of dehumidifiers it manufactured despite actual knowledge that the design and materials defects identified by GE were causing Gree Zhuhai's dehumidifiers to fail, overheat, and catch on fire.

31. The defendants knowingly sold over 1,000,000 dehumidifiers in the United States that they knew were defective because they did not incorporate the GE mandated design and materials changes into the other dehumidifiers.

*The Gree Companies Learn that Their Dehumidifiers Are Catching Fire*

32. For purposes of this complaint, Gree Zhuhai, Gree Hong Kong, Gree USA and MJC America are collectively referred to as the "Gree Companies."

33. On or about July 26, 2012, the CEO of Gree USA saw a video of a burning Gree dehumidifier. On July 26, 2012, Gree USA's CEO sent the video to a Gree Hong Kong manager ("Gree Hong Kong Manager #1"), who was also a director of Gree Hong Kong and in charge of exporting Gree appliances for sale in the United States, copying other Gree USA employees and a Gree Zhuhai employee. In sending the video, Gree USA's CEO labeled the email "urgent," and said that the video was "scarey [*sic*] to just watch" and a "very serious issue with GREE product quality." Gree USA's CEO also stated that the video was the third reported instance of a Gree appliance catching fire since in or about June 2012 and that it could lead to lawsuits against Gree USA as well as a recall costing millions of dollars. Gree USA's CEO knew that the Gree Companies had an obligation to inform the United States Consumer Product Safety Commission ("CPSC") immediately of any consumer product that contained a defect creating a substantial product hazard or that created an unreasonable risk of serious injury or death.

34. Gree Hong Kong Manager #1 replied to the July 26, 2012 email from Gree USA's CEO that same day. In his reply email, Gree Hong Kong Manager #1 said that "[w]e also felt shock when we watched the video[,]" and that he had sent the video to Gree Zhuhais' Quality Department and to Gree Zhuhais' chief engineer who was also its senior vice president for research and development.

35. During August 2012, Gree USA and Gree Zhuhai employees, engineers and officers investigated the Gree dehumidifiers for potential defects that could cause them to catch fire. No employee of Gree USA or Gree Zhuhai informed the CPSC of a defect or risk associated with the Gree dehumidifiers in August 2012.

36. On September 4, 2012, Gree USA's CEO emailed Gree Hong Kong Manager #1 about the Gree dehumidifiers. The CEO stated that Gree USA had tested its dehumidifier inventory in Gree USA's warehouse and the testing showed that these dehumidifiers burned. The CEO stated "the result is not like what you have told us" regarding how many units were involved because "the result shows the units all can catch fire and apparently is not according to UL standard! I don't think the factory is telling us the fact and truth. . . ." The CEO stated that, because of Gree USA's test results, he would have the dehumidifiers further tested for compliance with UL (formerly Underwriters Laboratory) standards and was planning to inform the CPSC about the Gree dehumidifiers.

37. On September 5, 2012, Gree Hong Kong Manager #1 emailed Gree USA's CEO instructing "Gree USA to resolve the claim and CPSC case" and stating that Gree Zhuhai would "fully indemnify Gree USA for any expense and responsibility." That same day, Gree USA's CEO replied and requested more details regarding who would pay the costs that could result from the Gree dehumidifiers and when they would pay, and offered to handle reporting the Gree dehumidifiers to the CPSC if Gree Zhuhai would agree to pay all future costs related to the dehumidifiers' defects. Gree Hong Kong Manager #1 replied on September 6, 2012, stating

that they were willing to agree to compensate expenses in a timely manner and that Gree USA "would be the single entity to reply insurance company and CPSC, [and] we will provide the necessary supports of test records and technical information if you need any." After these communications, no one from the Gree Companies informed the CPSC about the Gree dehumidifiers or their defects.

38. On September 10, 2012, Gree USA's CEO emailed the highest ranking person at Gree Zhuhai, the chairperson of Gree Zhuhai's board who also served as Gree Zhuhai's President and CEO, copying no one else from Gree Zhuhai or Gree Hong Kong. In this email, Gree USA's CEO stated that "GREE headquarters" had told him not to report the Gree dehumidifiers to the CPSC. Specifically, the Gree USA CEO stated that "GREE headquarters" had told him not to report that the Gree dehumidifiers may be defective and catch on fire and that they might have overheating parts and plastic parts that could burn because the plastic did not meet the UL standard for fire resistance. Gree USA's CEO warned in his email that any company or individual who withheld from the CPSC information about a dangerous product could face severe punishment, including criminal prosecution. Gree USA's CEO asked how Gree Zhuhai would pay future costs related to the Gree dehumidifiers, including any potential harm to MJC America Ltd. ("MJC America"), a company owned by Gree USA's CEO, CFO and CAO which also sold the defective Gree dehumidifiers. Gree USA's CEO stated that if Gree Zhuhai did not give him clear instructions on how to handle the Gree dehumidifiers within a matter of days, then he would inform the CPSC about the dehumidifiers. No one replied to this email.

39. On September 13, 2012, Gree USA's CEO sent another email to Gree Hong Kong Manager #1. In this email, Gree USA's CEO discussed how a recall of the defective Gree dehumidifiers might be handled and attached the CPSC's "Recall Handbook." Gree USA's CEO also discussed the financial costs and lost sales that could result from a recall. He did not express any consideration or concern about how defective Gree dehumidifiers could harm consumers. Gree USA's CEO asked Gree Hong Kong Manager #1 to forward this email to Gree Zhuhais' chief engineer.

40. On September 19, 2012, Gree Hong Kong Manager #1 came to Gree USA's offices in City of Industry, California, to meet with Gree USA's CEO. A Gree Zhuhai engineer and three other Gree USA officers also participated in the meeting. This meeting was audio recorded by agreement.

41. At this September 19 meeting, Gree Hong Kong Manager #1 stated that Gree Zhuhais' testing of the Gree dehumidifiers was not able to reproduce the reported fire, but had revealed two defects: (1) the dehumidifiers used plastics that did not meet UL standards for fire resistance; and (2) electrical arcing caused by the dehumidifiers' compressors overheating could burn the non-UL standard plastic used in these dehumidifiers. The Gree Zhuhai engineer at the meeting also discussed these defects. Gree Hong Kong Manager #1 stated that he was aware of at least five consumer reports of Gree dehumidifiers overheating and catching fire but that Gree Zhuhai "still believe[d] that the fire case is a relatively isolated case . . . associated with atrocious conditions." He also stated that Gree Zhuhai would modify the manufacture of all future dehumidifiers to fix this problem so they would not catch fire.

*The Gree Companies Decide to Delay Reporting and Recalling Their Defective Dehumidifiers*

42. At this same September 19 meeting, Gree Hong Kong Manager #1 said that the meeting participants' decisions on what to do about the Gree dehumidifiers should be guided by the principle of minimizing the costs and loss of reputation to the Gree Companies. Gree Hong Kong Manager #1 said that Gree Zhuhai wanted to delay any recall of the dehumidifiers for 6 to 9 months because delaying a recall would reduce the recall's effects on Gree dehumidifier sales. Gree Hong Kong Manager #1 stated that an immediate recall would have a significant, and negative, effect on 2012 and 2013 Gree dehumidifier sales. Gree Hong Kong Manager #1 stated that a recall could be delayed 6 to 9 months because cooler fall and winter temperatures would help prevent Gree dehumidifiers from overheating and catching fire, and that there should be very few, if any, dehumidifier fires in the 6 to 9 months following September 2012.

43. In response to what Gree Hong Kong Manager #1 said, Gree USA's CEO said at the meeting that the Gree dehumidifiers' defects were very significant and had important legal implications. But the Gree CEO did not push to inform the CPSC of the dehumidifiers. Rather, Gree USA's CEO recommended only that the Gree Companies have another company test the Gree dehumidifiers and then decide whether to delay the recall. Gree Hong Kong Manager #1 responded by urging the Gree USA officers not to conduct such a test of the Gree dehumidifiers because the test would show that the dehumidifiers used plastic that did not meet UL standards for fire resistance. Gree USA's CEO said that the Gree USA officers understood what Gree Zhuhai was asking them to do and needed time to think before making a decision about how to proceed.

44. Two days after the September 19, 2012 meeting, Gree USA's CEO sent an email to Gree Zhuhai's chief engineer and copied the email to Gree Zhuhai's board chairperson. In his September 21, 2012 email, Gree USA's CEO said that he understood that Gree Zhuhai wanted to delay a recall of the Gree dehumidifiers for 6 to 9 months. Gree USA's CEO also said that he thought that the Gree dehumidifiers were still likely to catch fire, and that, after careful consideration, Gree USA's officers had decided to report the Gree dehumidifiers to the United States government.

45. The next day, Gree Zhuhai's chief engineer replied to the September 21, 2012 email from Gree USA's CEO without copying Gree Zhuhai's board chairperson. In his September 22, 2012, email, Gree Zhuhai's chief engineer said that Gree Zhuhai had clearly expressed its opinion about how to handle the defective Gree dehumidifiers, and that he hoped Gree USA's CEO would follow that opinion. Gree Zhuhai's chief engineer said that he had no authority to approve what Gree USA's CEO proposed in his September 21, 2012 email and that he hoped Gree USA's CEO would report his decision on how to handle the defective Gree dehumidifiers to Gree Zhuhais' board chairperson and listen to her opinion.

46. On September 28, 2012, Gree USA's CEO sent an email to Gree Zhuhai's board chairperson, copying no one else from Gree Zhuhai or Gree Hong Kong. In his email, Gree USA's CEO stated again that Gree's dehumidifiers had two known defects: (1) the compressors in the dehumidifiers could overheat; and (2) the plastic in the dehumidifiers did not meet UL standards for fire resistance, meaning that the plastic would burn when overheated. Gree USA's CEO said that it was known that these two defects would cause the dehumidifiers to catch fire and that there were numerous consumer complaints about the dehumidifiers in fact

catching fire. Gree USA's CEO also said that the Gree companies had sold millions of these defective dehumidifiers. Gree USA's CEO further related that he believed the Gree Companies should recall the dehumidifiers and warn consumers that using them could result in personal injuries and property damage, but that Gree Zhuhai had not agreed to a recall. Gree USA's CEO warned that a recall oddly cost hundreds of millions of dollars, would harm the reputation of Gree products, and would reduce the Gree Companies' market share. But Gree USA's CEO also warned that if Gree Zhuhai did not reach an agreement with Gree USA on the recall of the dehumidifiers, then Gree USA unilaterally would report the Gree dehumidifiers to the United States government. Gree USA's CEO concluded his email by saying that this was a very important and urgent matter. Neither Gree Zhuhais' board chairperson nor anyone else at Gree Zhuhai replied to this email.

47. Despite the Gree USA's CEO's September 4, 10, 21 and 28, 2012 emails, no employee of the Gree Companies reported the Gree dehumidifiers' defects or risks, or the known consumer complaints of fires related to the dehumidifiers, to the CPSC in September 2012.

48. In September 2012, Gree USA sold at least 24,999 defective Gree dehumidifiers to retailers in the United States for approximately $2,558,019. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

49. On October 19, 2012, a sales representative for Gree USA met in person with Gree Zhuhai's board chairperson in China. During this meeting, the sales representative discussed the defective Gree dehumidifiers with Gree Zhuhai's board chairperson. Gree Zhuhai's board chairperson said that she would send a new Gree Hong Kong manager ("Gree Hong Kong Manager #2") to the United States to address the problems associated with the dehumidifiers.

50. In October 2012, Gree USA sent to Gree Zhuhai new consumer reports of fires related to the Gree dehumidifiers. These reports contradicted Gree Hong Kong Manager #1's statements at the September 19 meeting that a recall could be delayed 6 to 9 months because cooler fall and winter temperatures would help prevent dehumidifiers from overheating and catching fire and that there should be very few, if any, dehumidifier fires in the 6 to 9 months following September 2012. Despite these new consumer reports of fires caused by Gree dehumidifiers, no employee of the Gree Companies informed the CPSC about the dehumidifiers' defects or risks in October 2012.

51. In October 2012, Gree USA sold at least 2,938 defective Gree dehumidifiers to retailers in the United States for approximately $429,426. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

14

*The Gree Companies Receive Another Test Report Showing That Their Dehumidifiers are
Defective and Dangerous*

52. In late October 2012, Gree USA sent two Gree dehumidifiers to an independent testing

company for testing. On November 5, 2012, the testing company wrote a report confirming

and reiterating that the Gree dehumidifiers were defective because the compressors in the

dehumidifiers could run continuously and thereby overheat to an "extreme high

temperature." Gree USA's CEO received this report on November 6, 2012. Gree USA's CEO

immediately sent the report to Gree Hong Kong Manager #2, who had taken over

responsibility for the importation and sale of the Gree dehumidifiers in the United States

from Gree Hong Kong Manager #1.

*The Gree Companies Continue to Sell Their Defective Dehumidifiers
in the United States Without Reporting Them to the CPSC*

53. At the end of November 2012, Gree USA's CEO told Gree Hong Kong Manager #2 that an

attorney advised him to inform the CPSC immediately of all consumer reports of fires

related to the Gree dehumidifiers. Despite this legal advice and the November 5, 2012 test

report reiterating that the Gree dehumidifiers were dangerously defective, no employee of

the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported

fires in November 2012.

54. In November 2012, Gree USA sold at least 6,817 defective Gree dehumidifiers to retailers in

the United States for approximately $792,067. The Gree Companies knew that the retailers

wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree

Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met

all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations

that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

*The Gree Companies Have Yet Another Meeting to Discuss Their Defective Dehumidifiers But Still Do Not Inform the CPSC*

55. On December 18, 2012, Gree USA's CEO and another Gree USA officer went with an attorney to Hong Kong to meet with Gree Hong Kong Manager #2, a Gree Zhuhai engineer, Gree Zhuhai's Chief Financial Officer ("CFO") and three attorneys representing Gree Zhuhai. At this meeting, Gree USA's CEO discussed the November 5, 2012 test report with Gree Hong Kong Manager #2, the Gree Zhuhai engineer and the Gree Zhuhai CFO. Gree Hong Kong Manager #2, the Gree Zhuhai engineer and the Gree Zhuhai CFO told Gree USA's CEO that Gree Zhuhai would test the Gree dehumidifiers and let him know the results of their testing.

56. No employee of the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in December 2012.

57. In December 2012, Gree USA sold at least 1,395 defective Gree dehumidifiers to retailers in the United States for approximately $201,835. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

*The Gree Companies Decide to Keep Selling Their Defective Dehumidifiers in the United States Without Reporting Them to the CPSC*

58. On January 23, 2013, a Gree USA officer sent an email to Gree Hong Kong Manager #2. The email stated that Gree USA's and MJC America's insurance company suggested that Gree

16

USA report the Gree dehumidifiers to the CPSC and recall all of the defective Gree dehumidifiers. The email also stated that the insurance company "wanted to know if any actions were taken to test the product design in case it is defective" and was told that "the product was submitted to several different testing and no faulty [*sic*] in the design was found[,] also that new production has an extra protection[.]" The Gree USA office further reported in her email that Gree USA had received a new consumer report of a dehumidifier fire and asked how Gree USA should handle this report.

59. Also on January 23, 2013, Gree Zhuhai told Gree USA in writing that it had tested its dehumidifiers that they were not defective and could be sold in the United States. Gree Zhuhai did not provide Gree USA with any details on its testing or explain the inconsistency in its test results with those of all prior tests of the dehumidifiers.

60. Despite the recommendation of Gree USA's insurance company to report the Gree dehumidifiers to the CPSC and recall the defective dehumidifiers, and the new consumer report of fire, no employee of the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in January or February 2013.

61. Gree USA sold at least 7,609 and 29,857 defective Gree dehumidifiers in January and February 2013, respectively, to retailers in the United States for approximately $905,291, and $3,255,542, respectively. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations

17

that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

*The Gree Companies Finally Report Their Defective Dehumidifiers to the CPSC but Continue to Sell Those Dehumidifiers in the United States*

62. On March 14, 2013, Gree USA, Gree Zhuhai, and MJC America made an initial report to the CPSC about their dehumidifiers. The initial report stated that they had sold approximately 1.6 million Gree dehumidifiers in the United States since 2010, and that consumers who had purchased those dehumidifiers had reported fires, overheating, smoke, odors, and property damage related to those dehumidifiers. The initial report did not mention the defects in the Gree dehumidifiers that caused the dehumidifiers to burn.

63. Gree USA sold at least 6,025 and 7,596 defective Gree dehumidifiers in March and April 2013, respectively, to retailers in the United States for approximately $571,702 and $799,244, respectively. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

64. On April 23, 2013, the Chief Administrative Officer of Gree USA received an independent test report showing that the plastic used in four Gree dehumidifiers made in 2010, 2011, and 2012 did not meet UL standards for fire resistance.

65. On April 30, 2013, Gree USA, Gree Zhuhai, and MJC America made a second, more comprehensive report to the CPSC about their defective Gree dehumidifiers. This report

stated that Gree USA, Gree Zhuhai, and MJC America sold approximately 1.84 million of the Gree dehumidifiers and that they had not concluded that these Gree dehumidifiers posed a substantial product hazard or that these dehumidifiers needed to be recalled. This report listed nineteen known consumer reports of fires involving Gree dehumidifiers with all but one of the fires occurring between June 14, 2012 and April 15, 2013.

66. After their April 30, 2013 report to the CPSC, the Gree Companies continued to receive consumer reports of fires caused by Gree dehumidifiers.

67. The Gree Companies received at least $9,500,000 from the distribution and wholesale of defective Gree dehumidifiers from September 2012 through April 2013. Additionally, the Gree Companies received at least $29,500,000 from the distribution and wholesale of other non-defective Gree dehumidifiers from September 2012 through April 2013.

68. United States consumers lost at least $17,400,000 by purchasing defective and dangerous Gree dehumidifiers manufactured, distributed, or sold by the Gree Companies from September 2012 through April 2013.

69. From September 2012 to April 2013, United States consumers sustained at least $2,100,000 worth of property damaged or destroyed in fires caused by the defective Gree dehumidifiers.

*The Gree Companies Imported Their Defective Dehumidifiers With False UL Certifications*

70. Between 2010 and at least until September 2012, the Gree Companies imported into the United States Gree dehumidifiers with certifications that the dehumidifiers met all UL standards, when in fact the dehumidifiers did not meet UL standards.

*The Gree Companies Issue Their First Recall of Their Defective Dehumidifiers*

71. By mid-July 2013, Gree Zhuhai decided to recall its defective Gree dehumidifiers and notified the CPSC of this decision. After making this decision, Gree Zhuhai started to plan for the recall.

72. On September 12, 2013, Gree Zhuhai and the CPSC announced a voluntary recall of 2.2 million Gree dehumidifiers in the United States.

73. Despite its recall, Gree Zhuhai has received hundreds of consumer reports of fires and overheating caused by defective Gree dehumidifiers. Consumers have reported more than 2,000 incidents involving Gree dehumidifiers, including 450 fires and more than $19,000,000 in property damage.

74. No later than September 19, 2012, each of the Gree Companies had information which reasonably supported the conclusion that their Gree dehumidifiers: (1) contained defects which created a substantial product hazard, that is, a substantial risk of injury to the public; and (2) created an unreasonable risk of serious injury or death. After learning this information, each of the Gree Companies knowingly and willfully failed immediately to inform the United States Consumer Product Safety Commission about these dangerous defects in their Gree dehumidifiers or the dangerous risks posed by their Gree dehumidifiers.

75. As a result of the Gree Companies' failure to report immediately their defective Gree dehumidifiers to the United States Consumer Product Safety Commission, the Gree Companies were able to continue to distribute and wholesale their dehumidifiers, including defective dehumidifiers, from September 2012 through April 2013, and received more than $39,000,000 in proceeds from this distribution and wholesale of Gree dehumidifiers. For

purposes of forfeiture, the approximately $39,000,000 that the Gree Companies received are assets associated with their failure to report immediately their defective Gree dehumidifiers to the United States Consumer Product Safety Commission in violation of 15 U.S.C. §§2068(a)(4) and 2070.

### *The January 2014 Recall*

76. On January 30, 2014, the Consumer Product Safety Commission issued an announcement regarding the dehumidifiers that the Gree Companies were selling that stated the following:

> The firm has received 16 reports of incidents with the recalled GE-brand dehumidifiers, including 11 reports of overheating with no property damage beyond the units, and 5 reports of fires beyond the units which were associated with about $430,000 reported in property damage. This is in addition to more than 71 fires and $2,725,000 in property damage reported with other brands of Gree-manufactured dehumidifiers in the previous recall.

77. The CPSC then announced a new recall covering an additional 350,000 units (recall 14-095).

### *The May 2014 Recall*

78. On May 15, 2014, the Consumer Product Safety Commission issued an announcement regarding the dehumidifiers that the defendants were selling that stated the following:

> The number of reported incidents of overheating dehumidifiers has increased nearly 400 percent from 199 in the original recall (September 2013) to 471 reported incidents. The number of reported fires has increased more than 200 percent from 46 to 121 reported fires. Property damage reports have more than doubled from $2.15 million in the original recall to nearly $4.5 million.

79. The CPSC then announced that the recall was once again being expanded to include over 2,500,000 units (recall 14-179).

*The November 2016 Recall*

80. On November 26, 2016, the CPSC issued an announcement regarding the dehumidifiers that

the defendants were selling that stated:

> There have been more than 2,000 reported incidents of dehumidifiers
> overheating. About 450 fires have been reported, resulting in more than
> $19 million in property damage.

81. The CPSC then announced another recall (recall 17-039).

*The CPSC Civil Penalty*

82. On March 25, 2016, the CPSC issued an announcement in which it stated it had imposed a

$15,450,000 penalty on Gree Zhuhai, Gree Hong Kong, and Gree USA for the following

reasons:

> The penalty settles charges that Gree:
>
> • Knowingly failed to report a defect and unreasonable risk of serious
>   injury to CPSC immediately (within 24 hours) with dehumidifiers sold
>   under 13 different brand names, including Frigidaire, GE, Gree,
>   Kenmore and Soleus Air, as required by federal law;
>
> • Knowingly made misrepresentations to CPSC staff during its
>   investigation; and
>
> • Sold dehumidifiers bearing the UL safety certification mark knowing
>   that the dehumidifiers did not meet UL flammability standards.
>
> Gree's dehumidifiers had a defect that caused the machines to overheat
> and catch fire. Despite Gree receiving multiple reports of incidents, and
> despite making design changes to fix the problem, Gree failed to report the
> defect to CPSC immediately. Gree also failed to report the incidents or the
> design changes to CPSC immediately. These incidents began in July 2012
> and caused nearly $4.5 million in property damage.

*The Criminal Prosecution*

83. On October 26, 2021, The United States of America filed a criminal action against the Gree Companies in the United States District Court for the Central District of California, case no. 2:21-cr-00498-MCS ("the criminal case").

84. In the criminal case, a plea agreement was filed on October 28, 2021. The plea agreement states (on page 39 of 70), in part:

> Defendants Gree Electric Appliances, Inc. of Zhuhai ("Gree Zhuhai"), Gree USA, Inc. ("Gree USA"), and Hong Kong Gree Electric Appliances Sales Co., Ltd. ("Gree Hong Kong") (collectively the "Gree Companies") hereby agree and stipulate that the following information is true and accurate.

85. Exhibit B to the plea agreement is attached hereto as Exhibit 1, incorporated herein by reference as if fully set forth, and the facts set forth in Exhibit B to the plea agreement are realleged herein by reference.

86. On January 23, 2023, Gree USA, Inc., plead guilty to the Information filed in the criminal case. The Information is attached hereto as Exhibit 2, incorporated herein by reference as if fully set forth, and the facts set forth in the Information are realleged herein by reference.

*The Elgersma Fire*

87. In 2014, the Elgersmas purchased a Gree dehumidifier ("the dehumidifier").

88. The dehumidifier was among those eventually recalled by the Gree Companies.

89. On September 20, 2021, the dehumidifier spontaneously combusted, causing a fire ("the fire") at the Elgersmas' home, located at E2481 Silver Lake Road, Scandinavia, Wisconsin.

90. The fire caused damages to the Elgersmas' home and personal property.

91. At the time of the fire, the Elgersmas' home and personal property were insured against damage by SECURA Supreme Insurance Company. As required by its policy, SECURA paid to, or on behalf of the Elgersmas for the damages, and is subrogated to the rights of the Elgersmas to the extent of its payments.

## FIRST CAUSE OF ACTION: PRODUCT LIABILITY CLAIM
## AGAINST THE GREE COMPANIES

92. The preceding paragraphs are incorporated herein by reference.

93. The Gree Companies designed, engineered, manufactured, introduced into the stream of commerce and imported the dehumidifier that caused the fire.

94. The dehumidifier contained one or more design and/or manufacturing defects with foreseeable risks which could have been avoided by the adoption of a reasonable alternative design. Specifically, the defects include the following:

   a. They failed to use fire retardant plastic for the dehumidifier bodies with a UL94 rating of V-0.

   b. They used conductor insulation that contained plasticizer that leached out at temperatures inside the dehumidifier which were foreseeable and in the presence of moisture which, in a dehumidifier, is foreseeable.

   c. They located the thermal overload protector in proximity to the plasticizer-leaching conductor insulation, resulting in the plasticizer preventing the thermal overload protector from functioning as intended.

95. The defects caused the dehumidifier to spontaneously combust, resulting in the damages being claimed.

96. The dehumidifier's defective condition rendered it unreasonably dangerous to the Elgersmas' property.

97. The dehumidifier's defective condition existed at the time it left the control of the defendants.

98. The dehumidifier reached the Elgersmas without substantial change in the condition in which it was sold.

<u>**SECOND CAUSE OF ACTION: NEGLIGENCE CLAIM AGAINST THE GREE COMPANIES**</u>

99. The preceding paragraphs are incorporated herein by reference.

100. The Gree Companies owed the plaintiff and their insureds a duty to use reasonable care when they designed, engineered, manufactured, sold, and submitted for testing to UL the dehumidifiers that ultimately were purchased by the Elgersmas.

101. The Gree Companies breached their duty in the following and other ways:

    a. They failed to use fire retardant plastic for the dehumidifier bodies with a UL94 rating of V-0.

    b. They used conductor insulation that contained plasticizer that leached out at temperatures inside the dehumidifier which were foreseeable and in the presence of moisture which, in a dehumidifier, is foreseeable.

    c. They located the thermal overload protector in proximity to the plasticizer-leaching conductor insulation, resulting in the plasticizer preventing the thermal overload protector from functioning as intended.

d. They failed to stop selling, and recall, the dehumidifiers upon learning that they were causing fires.

102. The foregoing breaches of the defendants' duty were a cause of the fires and resulting damages.

**THIRD CAUSE OF ACTION:**
**CLAIM FOR PUNITIVE DAMAGES AGAINST THE GREE COMPANIES**

103. The preceding paragraphs are incorporated herein by reference.

104. The actions of Gree Zhuhai, Gree Hong Kong, Gree USA and MJC America were deliberate.

105. The actions of Gree Zhuhai, Gree Hong Kong, Gree USA and MJC America were in actual disregard of the safety, health, life, and property of the Elgersmas.

106. The actions of Gree Zhuhai, Gree Hong Kong, Gree USA and MJC America were sufficiently aggravated to warrant punishment by punitive damages.

107. The Elgersmas seek an award of punitive damages against Gree Zhuhai.

108. The Elgersmas seek an award of punitive damages against Gree Hong Kong.

109. The Elgersmas seek an award of punitive damages against Gree USA.

110. The Elgersmas seek an award of punitive damages against MJC America.

WHEREFORE, SECURA Supreme Insurance Company demands judgment against the defendants, jointly and severally, in an amount to be determined, plus prejudgment interest, punitive damages against Gree Zhuhai, Gree Hong Kong, Gree USA and MJC America, all taxable costs and fees, reasonable attorneys' fees, reasonable expert witnesses' fees, and all other just and equitable relief.

Dated: June 2, 2023.

RON HARMEYER LAW OFFICE LLC
Attorneys for SECURA Supreme Insurance
Company


*s/ Ronald W. Harmeyer*
Ronald W. Harmeyer
State Bar No. 1026579

330 E. Kilbourn Ave., Suite 1070
Milwaukee, WI 53202
Tel. (414) 316-2500
Fax (414) 755-7081
rharmeyer@ronharmeyerlaw.com